UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LINDA PINTRO, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 13-231 (RBW) |
| ) | |
| AJIT PAI, Chairman of the Federal ) | |
| Communications Commission, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## MEMORANDUM OPINION

The plaintiff, an African-American female of Haitian descent, filed this action against Ajit Pai in his official capacity as the Chairman of the Federal Communications Commission ("FCC") for allegedly discriminating against her based on her race and national origin, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2 to -17 (2012) ("Title VII"). See Complaint ("Compl.") ¶¶ 4, 26–31. Currently before the Court is the Defendant's Motion for Summary Judgment ("Def.'s Mot."). Upon careful consideration of the parties' submissions,[1] the Court concludes that it must deny the FCC's motion.

### I. BACKGROUND

The plaintiff,[2] an attorney, has been an FCC employee since 1996, Pl.'s Opp'n, Exhibit ("Ex.") 1 (Declaration of Linda Pintro ("Pintro Decl.")) ¶ 16, and a Senior Legal Advisor in the

---

[1] In addition to the filings already identified, the Court also considered the following submissions in rendering its decision: (1) the Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment ("Def.'s Mem."); (2) the Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Opp'n"); (3) the Defendant's Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Def.'s Reply"); (4) the Plaintiff's Surreply in Support of Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Surreply."); (5) the Defendant's Statement of Undisputed Material Facts ("Def.'s Facts"); and (6) the Statement of Disputed Material Facts in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Facts")).

[2] The plaintiff was formerly known as Linda Armstrong. See Compl. ¶ 6.

Strategic Analysis and Negotiations Division (the "Division") of the FCC's International Bureau from 1999 until she filed her Complaint in 2013, id., Ex. 1 (Pintro Decl.) ¶ 20; Compl. ¶ 6. Kathryn O'Brien, the Chief of the Division, was the plaintiff's supervisor from 2003 through 2009. See Def.'s Facts ¶ 3.

In early 2008, one of O'Brien's two Deputy Division Chief positions became vacant. See Pl.'s Opp'n, Ex. 8 (transcript of EEOC proceedings on May 11, 2012 ("May 11, 2012 Hearing Tr.")) at 182. O'Brien sought permission from the Associate Bureau Chief for Administration to post a vacancy announcement for the Deputy Division Chief position, but was told that she "was not likely to get hiring authority to fill that position." Id., Ex. 8 (May 11, 2012 Hearing Tr.) at 183. However, O'Brien and the Associate Bureau Chief for Administration agreed that she could fill the position "on an interim basis." Id., Ex. 8 (May 11, 2012 Hearing Tr.) at 186. O'Brien then asked Robert Tanner, a white male who was an attorney-advisor for the Division, to serve as an Acting Deputy Division Chief on an interim basis. See Def.'s Facts ¶ 5; Compl. ¶ 17; Pl.'s Opp'n, Ex. 8 (May 11, 2012 Hearing Tr.) at 189. O'Brien "had [Tanner] in mind" when she received approval for the interim position, Pl.'s Opp'n, Ex. 8 (May 11, 2012 Hearing Tr.) at 186, and she did not consider the plaintiff for the position, see id., Ex. 8 (May 11, 2012 Hearing Tr.) at 193.

Thereafter, the plaintiff filed a complaint of discrimination challenging her non-selection for the vacant Acting Deputy Division Chief position. See Def.'s Mot., Ex. B (Decision, EEOC No. 570-2009-00190X (Sept. 27, 2012) ("EEOC Decision")) at 1. The complaint was assigned to an Equal Employment Opportunity Commission ("EEOC") administrative law judge who, after conducting a hearing in which the plaintiff and five other witnesses testified, issued a decision in favor of the FCC. Id., Ex. B (EEOC Decision) at 1, 10.

The plaintiff subsequently commenced this litigation, alleging discrimination based on Tanner's promotion and seven other internal promotion decisions. See Pintro v. Wheeler, 35 F. Supp. 3d 47, 49 (D.D.C. 2014) (Walton, J.). Ruling on an earlier motion to dismiss filed by the FCC that the Court converted into a motion for summary judgment, the Court entered summary judgment in favor of the FCC regarding all of the promotional challenges raised by the plaintiff, with the exception of the Acting Deputy Division Chief position. See id. at 56.

## II. STANDARD OF REVIEW

Courts will grant a motion for summary judgment under Federal Rule of Civil Procedure 56(c) "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When ruling on a Rule 56 motion, the Court must view the evidence in the light most favorable to the non-moving party. Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006) (citing Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 150 (2000)). The Court must therefore draw "all justifiable inferences" in the non-moving party's favor and accept the non-moving party's evidence as true. Anderson v. Liberty Lobby, 477 U.S. 242, 255 (1986).

In responding to a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Accordingly, the non-moving party must not rely on "mere allegations or denials . . . but . . . must set forth specific facts showing that there [are] genuine issue[s] for trial." Anderson, 477 U.S. at 248 (second omission in original) (citation and internal quotation marks omitted). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position [is] insufficient" to withstand a motion for summary judgment, as "there must be [some] evidence on which the jury could reasonably find for the [non-movant]." Id. at 252.

3

## III. ANALYSIS

Title VII protects federal employees from discrimination on the basis of race or national origin, among other protected factors. See 42 U.S.C. § 2000e-16(a). In the absence of direct evidence of discrimination, as is the situation here, claims of employment discrimination under Title VII are analyzed under the three-part framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Jackson v. Gonzales, 496 F.3d 703, 706 (D.C. Cir. 2007). Under this framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination by providing proof of "(1) membership in a protected group; (2) qualification for the job in question; (3) an adverse employment action; and (4) circumstances that support an inference of discrimination." Swierkiewicz v. Sorema N.A., 534 U.S. 506, 510 (2002). If the plaintiff establishes a prima facie case, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the [adverse employment action]." McDonnell Douglas, 411 U.S. at 802.

However, where the defendant "has asserted a legitimate, nondiscriminatory reason" for the adverse employment action in the context of a summary judgment motion, this Circuit has held that "the [ ] court need not—and should not—decide whether the plaintiff actually made out a prima facie case under McDonnell Douglas." Brady v. Office of Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008). Rather, the Court must evaluate only whether "the employee [has] produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason [for the adverse employment action] and that the employer intentionally discriminated against the employee on the basis of race [or national origin]." Evans v. Sebelius, 716 F.3d 617, 620 (D.C. Cir. 2013) (quoting Brady, 520 F.3d at 494). "Because in appropriate cases a 'factfinder's disbelief of the reasons put forward by the defendant' may support an inference of intentional discrimination, [the Circuit] do[es] not

routinely require plaintiffs 'to submit evidence over and above rebutting the employer's stated explanation in order to avoid summary judgment.'" Hamilton v. Geithner, 666 F.3d 1344, 1351 (D.C. Cir. 2012) (first quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993), then quoting Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1290 (D.C. Cir. 1998)).

Here, the FCC cites O'Brien's EEOC interview and hearing testimony as support for her decision not to appoint the plaintiff as an Acting Deputy Division Chief. See Def.'s Mem. at 5–7 (quoting Def.'s Mot., Ex. A (Interview of Kathryn O'Brien ("O'Brien Interview"))); Pl.'s Opp'n, Ex. 8 (May 11, 2012 Hearing Tr.)). During the EEOC hearing, O'Brien testified that the Division "ha[s] to be willing to sort of go with the flow, rearrange priorities, rearrange responses [sic] really on a day-to-day basis." Pl.'s Opp'n, Ex. 8 (May 11, 2012 Hearing Tr.) at 178–79. O'Brien also stated in her interview that a Deputy Division Chief must be able to

> manage up the chain to [the] bureau chief and up to . . . our commissioners and our chairman, [and] also help [O'Brien] manage the branch chiefs below and their staff, where necessary, and help push things through and be sensitive to [ ] the management needs at the different levels of review.

Def.'s Mot., Ex. A (O'Brien Interview) at 47.

O'Brien testified that she did not consider the plaintiff for the Acting Deputy Division Chief position because

> one of the main skill sets that [O'Brien] needed, and it's a real skill set, and not everybody has it[,] is the ability to handle multiple issues at once and to have deadlines change and expectations change and input change, and you just have to sort of swallow that and do it, and [O'Brien] had observed through the time working with [the plaintiff] that that was not her strong suit, but [O'Brien] had observed in working with [ ] Tanner that he was very good at that."

Pl.'s Opp'n, Ex. 8 (EEOC Hearing Tr.) at 193–94. O'Brien explained in her interview with the EEOC investigator that she recalled

> a fair number of instances where, working on different projects, staff have had a difficult time working with [the plaintiff], and, for a deputy, where [O'Brien] need[ed] somebody to be essentially [her] alter ego and work with staff, that would [have] add[ed] another whole layer of complication for [her], if [she] ha[d]

5

> to smooth over difficult relationships with staff. In addition, it indicated to [O'Brien] that [she] might have [had] challenges managing up the chain if [the plaintiff] continued to prove difficult to work with.

Def.'s Mot., Ex. A (O'Brien Interview) at 48. When asked for specific examples of her concerns about the plaintiff, O'Brien recalled receiving feedback from staff regarding the plaintiff's work on the "KSDS" case, see id., Ex. A (O'Brien Interview) at 49–50, and the plaintiff's supervision of a legal intern, see id., Ex. A (O'Brien Interview) at 48. In her testimony at the EEOC hearing, O'Brien also mentioned experiencing difficulties with the plaintiff during her work on the "Quetzal" case. See Pl.'s Opp'n, Ex. 8 (May 11, 2012 Hearing Tr.) at 156. O'Brien also explained that

> on one level, . . . [the plaintiff] is extremely responsive and extremely professional and courteous and kind . . . . So the abrasiveness that I described, and there is an abrasiveness, is understated. It doesn't hit you in the face. . . . [I]t isn't immediately obvious with [the plaintiff], but once you get into a project, again, it's like pulling teeth, and then there will come times when there is this extremely sort of dismissive, almost sort of contemptuous, interaction with [s]ome peers . . . and people down the chain a little bit.

Def.'s Mot., Ex. A (O'Brien Interview) at 71.

The Court is satisfied that the FCC has asserted legitimate, non-discriminatory reasons for not selecting the plaintiff for the Acting Deputy Division Chief position—namely, that the plaintiff (1) lacked the ability to handle multiple issues with changing deadlines and expectations, see Pl.'s Opp'n, Ex. 9 (EEOC Hearing Tr.) at 194; and (2) had difficulties working with other staff on group projects due to the plaintiff's "understated" "abrasiveness" and "dismissive, almost sort of contemptuous, interaction with . . . peers," Def.'s Mot., Ex. A (O'Brien Interview) at 71; see also Woodruff v. Dimario, 164 F. Supp. 2d 1, 6 (D.D.C. 2001) ("A subjective reason can be legally sufficient, legitimate, and nondiscriminatory if the defendant articulates a clear and reasonably specific factual basis upon which it based its subjective opinion."), aff'd, No. 01-5321, 2002 WL 449776 (D.C. Cir. Feb. 21, 2002). "[The

6

Court] therefore turn[s] directly to the central issue: whether [the plaintiff] produced evidence sufficient for a reasonable jury to find that the employer's stated reason[s] [not to promote her] w[ere] not the actual reason[s] and that the employer intentionally discriminated against [the plaintiff] based on [her race and national origin]." Adeyemi v. District of Columbia, 525 F.3d 1222, 1227 (D.C. Cir. 2008).

The plaintiff argues that a reasonable jury could find that O'Brien's reasons for not considering her for the Acting Deputy Division Chief position—namely, her weaknesses in handling competing issues and adjusting to changing deadlines and expectations, see Pl.'s Opp'n, Ex. 8 (May 11, 2012 Hearing Tr.) at 194, and her difficulty working with other staff, see Def.'s Mot., Ex. A (O'Brien Interview) at 71—were pretextual because not only is there is no evidence in the record contemporaneously documenting these alleged weaknesses, but the contemporaneous evidence that is before the Court actually demonstrates the plaintiff's strengths and qualifications in these areas, see Pl.'s Opp'n at 15, 25–27; see, e.g., Aka, 156 F.3d at 1295, 1297–98 (declining to give the defendant's conclusion that the plaintiff was not an enthusiastic candidate "too much weight at summary judgment [because the defendant] did not comment at all on [the plaintiff's] enthusiasm (or lack thereof) on the interview summary sheet, weakening her claim that [the plaintiff's] lack of enthusiasm motivated her decision"). The FCC argues in response that O'Brien's perceptions of the plaintiff's weaknesses "are supported by contemporaneous documentary evidence." Def.'s Reply at 16–17.

As the plaintiff correctly notes, because "courts traditionally treat explanations that rely heavily on subjective considerations with caution," Aka, 156 F.3d at 1298, an "absence of any contemporaneous documentation supporting [O'Brien's] explanation could lead a reasonable jury to disbelieve [her] and to reach a verdict in [the plaintiff's] favor," Hamilton, 666 F.3d at 1357; see also Colbert v. Tapella, 649 F.3d 756, 759 (D.C. Cir. 2011) (denying summary

7

judgment because, among other reasons, nothing in the record supported the defendant's explanation for not hiring the plaintiff). Therefore, the Court will consider whether there is contemporaneous evidence supporting O'Brien's specific examples of the challenges she contends she experienced working with the plaintiff.

A.     **The Quetzal Case**

In her EEOC hearing testimony, which was provided in 2012, O'Brien referenced the Quetzal case as support for her position about the plaintiff, see Pl.'s Opp'n, Ex. 8 (May 11, 2012 Hearing Tr.) at 1, 155–56, which was a 2005 project that the plaintiff worked on, see Def.'s Reply at 16. O'Brien described that case as having "some tricky engineering issues," as well as "some really politically sort of challenging issues because [the Division was] working with Mexico on the issues," Pl.'s Opp'n, Ex. 8 (May 11, 2012 Hearing Tr.) at 156, and stated that "the most serious problems [with the plaintiff's work] arose with [that] case and the inability to advance the work on the order," id., Ex. 8 (May 11, 2012 Hearing Tr.) at 209. When asked to describe her specific concerns with respect to the plaintiff's work on the Quetzal case, O'Brien explained:

> Well, it was a long time ago, so I don't remember again the real specifics of the case, but what I do recall is the division of responsibilities in drafting the order, and there were some real frustrations in getting the work done, and I felt that I had to keep clarifying exactly what I wanted done, and that every time I clarified, there would be sort of push-back about what I meant and how that had changed.
>
> Then, when we were finally able to brief the Chairman's office on it, and we had to move much more quickly, that created some real sort of consternation about the timing, and, you know, the truth is, we just have to move. When the Chairman's office wants it done, we have to move, and I felt that I really had to sort of cajole the process along, and that created challenges for me with the team as a whole and also with my front office.
>
> ∗∗∗
>
> [W]hat I tried to do with that order was to have a clear division of responsibilities, who was responsible for what, and I felt that every time I asked [the plaintiff] for her input, I got sort of push-back about exactly what it was I wanted her to do,

8

> and I kept trying to clarify, and I kept trying to clarify, but it kept being thrown back at me that I wasn't being clear, and I felt that there was sort of nothing I could do to make this process go smoother and to get her to sort of accept responsibility for what it was that I needed instead of to keep asking for clarification time and time again.
>
> At one point, I got frustrated enough that I just asked another person to write the entire order, but then as these things go, that person ended up having to be pulled for another project that the front office wanted, and so I had to go back and ask for assistance again, and I felt that it shouldn't be that hard to get a legal advisor to write an order or even a section of an order.

Id., Ex. 8 (May 11, 2012 Hearing Tr.) at 156–58. O'Brien, however, conceded that she did not share her concerns regarding the plaintiff's work on the Quetzal case with the plaintiff directly, see id., Ex. 8 (May 11, 2012 Hearing Tr.) at 211–12, and neither party submitted the plaintiff's annual performance evaluation for the rating period covering the time in 2005 when work was being performed in the Quetzal case, see id., Ex. 3 (performance evaluations) at 22–29 (the plaintiff's performance evaluations for the rating period of July 1, 2003, to June 30, 2004, and for the rating period of January 31, 2006, to September 30, 2006).[3] Therefore, the only contemporaneous evidence in the record that could support O'Brien's account of the difficulties regarding the plaintiff's work on the Quetzal case is an exhibit containing "[c]ontemporaneous emails from August through October 2005" regarding the project. Def.'s Reply at 17; see also id., Ex. H (e-mails regarding Quetzal project ("Quetzal e-mails")).

The FCC argues that these e-mails "reflect [the p]laintiff's resistance to an engineer's advice, her need for continued clarification about expectations, difficulties with a changed and

---

[3] The plaintiff also cites as rebuttal evidence the performance award she received for the Quetzal case, see Pl.'s Opp'n, Ex. 4 (performance awards) at 16 (Superior Achievement Award for the plaintiff's efforts regarding Quetzal Communications' application for a Special Temporary Authority license), but, according to the FCC, the plaintiff received this award for her work at the beginning of the case, before the alleged performance problems occurred, see Def.'s Reply at 17 n.9 (stating that the award "was issued on June 10, 2005, which predates the problems identified"). Given the Court's duty to evaluate all evidence in the light most favorable to the plaintiff, see Holcomb, 433 F.3d at 895, the Court agrees that the performance award could, from a jury's perspective, undermine O'Brien's reliance on her recollection that her "most serious problems" with the plaintiff arose during the Quetzal case, see Pl.'s Opp'n, Ex. 8 (May 11, 2012 Hearing Tr.) at 209; see also Colbert, 649 F.3d at 759 (noting that "nothing in the record support[ed]" the defendant's reasons for not hiring the plaintiff, given that the plaintiff "received numerous awards and commendations, including eight outstanding performance awards").

9

accelerated deadline made at the behest of the Chairman, and that other [Division] personnel were required to take over the project to ensure its timely completion." Def.'s Reply at 17; see also id., Ex. H (Quetzal e-mails). The plaintiff argues in response that that these e-mails

> do not show that [the plaintiff] had interpersonal issues. Reply[,] Ex. H. At most, these e[-]mails reflected some miscommunications between parties, but none show that the miscommunication was caused by [the plaintiff]. See Reply[,] Ex. H at 5 ("I guess there was a misunderstanding when we met last week."). Indeed, whenever [the plaintiff] was uncertain that she was on the same page as a coworker, she sent an e[-]mail requesting clarification to proactively prevent misunderstandings. See Reply[,] Ex. H at 1, 4.

Pl.'s Surreply at 17–18.

Upon review of the e-mails, the Court finds that both parties' interpretations are plausible. The e-mails document shifting deadlines and responsibilities regarding an order to resolve a petition before the FCC. See generally Def.'s Reply, Ex. H (Quetzal e-mails). The Court declines to determine which party's interpretation of the significance of the e-mails is more credible because to do so would require the Court to weigh the evidence, which it may not do at the summary judgment stage. See Aka, 156 F.3d at 1299 (noting that credibility determinations are made by the finder of fact). Accordingly, the Court concludes that a genuine dispute of material fact exists regarding whether the e-mails constitute contemporaneous evidence that supports O'Brien's proffered reasons for not considering the plaintiff for the Acting Deputy Division Chief position.

**B.     The KSDS Case**

O'Brien also referenced the KSDS case in her EEOC hearing testimony as an example of her difficulty in working with the plaintiff. See Pl.'s Opp'n, Ex. 8 (May 11, 2012 Hearing Tr.) at 166. The KSDS case, a 2006 project, see Def.'s Reply at 16, "involved coordinating with another Bureau to draft and issue an order and related public notices related to another [license] application," id. at 17; see also Pl.'s Opp'n, Ex. 7 (EEOC Hearing Tr.) at 117–18 (the plaintiff

10

describing the KSDS case as "a request by a company in the [United States] to send its programming to Mexico for a Mexican broadcaster to send it back into the [United States] for advantageous reasons"). In her testimony, O'Brien stated that her concerns with the plaintiff's work on the KSDS case were not "as big of an issue as the Quetzal case," Pl.'s Opp'n, Ex. 8 (May 11, 2012 Hearing Tr.) at 166, but described those concerns as follows:

> I think [the plaintiff] was not 100 percent comfortable with the initial cuts [from the order] or with the feedback that various participants in the case were providing and was sort of reluctant to carry that forward and just sort of accept those cuts and move forward with writing the order with the feedback we had been given and with the feedback the engineers and the folks who had been involved with Mexico for longer than I had were recommending.

Id., Ex. 8 (May 11, 2012 Hearing Tr.) at 166–67.

The FCC claims that "O'Brien did document her concerns regarding these matters and communicate them to [the p]laintiff," Def.'s Reply at 17 (internal citations and quotation marks omitted), and cites the plaintiff's performance evaluation for the period covering January 31, 2006 through September 30, 2006, as support for this assertion, see id.; see also id., Ex. I (Employee Review Form for Supervisors and Managers signed on Jan. 26, 2007 ("2006 Performance Review")) at 1.[4]

The plaintiff initially received an overall summary rating of "fully successful" on her 2006 performance review, which is the second lowest of four possible scores. See id., Ex. I (2006 Performance Review) at 1. In a subsequent e-mail, the plaintiff told O'Brien that she "was troubled by the evaluation . . . and would appreciate another opportunity to discuss it with [her]." Id., Ex. I (2006 Performance Review) at 6 (e-mail from the plaintiff to O'Brien dated January 23, 2007 ("Jan. 23, 2007 e-mail")). In that same e-mail, the plaintiff noted that O'Brien had "indicated that [she] gave [the plaintiff] a 'fully successful' rating for 3 of the 4 'Critical

---

[4] The page numbers for Def.'s Reply, Ex. I, as well as Pl.'s Opp'n, Exs. 3 and 4, refer to those generated by the Court's ECF system.

11

Performance Elements' because [O'Brien] w[as] not impressed with [the plaintiff's] level of communication on the KSDS matter." Id., Ex. I (2006 Performance Review) at 6 (Jan. 23, 2007 e-mail). The plaintiff told O'Brien that after reviewing her communications about the case, she did not perceive any indications of communication failures. Id., Ex. I (2006 Performance Review) at 6 (Jan. 23, 2007 e-mail). The plaintiff concluded her e-mail by telling O'Brien that she was "hopeful that reviewing the facts together will cause [O'Brien] to reconsider the ratings." Id., Ex. I (2006 Performance Review) at 6 (Jan. 23, 2007 e-mail). Thereafter, O'Brien did in fact increase the plaintiff's overall rating from "fully successful" to "excellent," the second highest of the four scores. See id., Ex. I (2006 Performance Review) at 11 (Employee Review Form for Supervisors and Managers signed on Mar. 12, 2007 ("2006 Amended Performance Review").

Upon its review of the original 2006 performance review, the plaintiff's January 23, 2007 e-mail, and the amended 2006 performance review, the Court concludes that, although O'Brien clearly discussed her concerns regarding the plaintiff's work on the KSDS case, see id., Ex. I (2006 Performance Review) at 6 (Jan. 23, 2007 e-mail), the fact that O'Brien later increased the plaintiff's overall rating after the plaintiff had asked her to "review[] the facts" and "reconsider the ratings," id., Ex. I (2006 Performance Review) at 6 (Jan. 23, 2007 e-mail), undermines the FCC's argument that the original 2006 performance review provides contemporaneous evidence of the difficulties the plaintiff experienced when she worked on the KSDS case. In other words, a reasonable jury could infer that O'Brien's decision to increase the plaintiff's rating shows that O'Brien agreed with the plaintiff's position that she did not exhibit any communication failures while working on the case. Again, the weight and credibility determinations regarding O'Brien's testimony, the performance reviews, and the e-mails are tasks for the factfinder, not the Court at this stage of the litigation. See Aka, 156 F.3d at 1299 ("This case thus turns on whose account of

[O'Brien's performance evaluation of the plaintiff] is correct; that question will hinge on [O'Brien's and the plaintiff's] credibility, an issue that is quintessentially one for the finder of fact.").[5]

## C. The Plaintiff's Supervision of an Intern

O'Brien also referenced in her EEOC hearing testimony the plaintiff's mentorship and supervision of a legal intern as a reason why she did not consider the plaintiff for the Acting Deputy Division Chief position. See Pl.'s Opp'n, Ex. 8 (May 11, 2012 Hearing Tr.) at 168. O'Brien testified that the person overseeing the intern program "brought concerns to [her]" regarding the plaintiff's mentorship of an intern, see id., Ex. 8 (May 11, 2012 Hearing Tr.) at 168, after the intern had contacted the intern coordinator "and was very upset, and [the intern coordinator] was concerned [about] the supervision that he was being given," see id., Ex. 8 (May 11, 2012 Hearing Tr.) at 176–77; see also Def.'s Mot., Ex. A (O'Brien Interview) at 48 ("I had [the plaintiff] working with an intern on one particular project, and there were some interactions where the intern was really quite upset because [the plaintiff] had been kind of harsh with him, really harsh.").

The plaintiff argues that this reason for O'Brien's decision not to consider her for the Acting Deputy Division Chief position is pretextual and a post-hoc rationalization because "O'Brien had no personal knowledge of the situation, . . . O'Brien never documented any purported concerns she had regarding [the plaintiff's] treatment of the [intern,] . . . [nor did she] mention[] her concerns to [the plaintiff]." Pl.'s Opp'n at 25–26. Furthermore, the plaintiff provides evidence that the intern maintained contact with her after the internship ended. See id.,

---

[5] The plaintiff also cites various e-mails between the plaintiff and other staff regarding the KSDS project that, in her view, demonstrate her "exemplary performance and cooperative work . . . on the KSDS [p]roject, and [that] her teammates even sought her help while she was recuperating from major surgery." Pl.'s Opp'n at 26 (citing id., Ex. 15 (e-mails regarding KSDS project ("KSDS e-mails")). Given that the Court has already concluded that a reasonable jury could conclude that O'Brien's purported problems with the plaintiff's work on the KSDS case could be found by a jury to be pretextual, the Court need not also consider these e-mails, nor would it be appropriate for the Court to determine the weight these e-mails are entitled to receive at this stage of the case.

Ex. 14 (e-mail exchange between the intern and the plaintiff dated October 16 and 17, 2005 ("intern e-mails")) at 1.

The Court agrees that the e-mail exchange between the intern and the plaintiff following the conclusion of the internship, which the intern initiated, see id., Ex. 14 (intern e-mails) at 1, undermines O'Brien's testimony that the plaintiff's supervision of the intern was problematic, see Pl.'s Opp'n, Ex. 8 (May 11, 2012 Hearing Tr.) at 168. The FCC concedes that the plaintiff has created a dispute of fact regarding "whether [O'Brien's] reason was untrue," but claims that this dispute is "only a weak issue of fact." Def.'s Reply at 18 n.10 (quoting St. John v. Napolitano, 20 F. Supp. 3d 74, 93 (D.D.C. 2013)). The Court concludes that the e-mail exchange between the intern and the plaintiff, coupled with the "absence of any contemporaneous documentation supporting [O'Brien's] explanation [regarding the plaintiff's supervision of the intern] could lead a reasonable jury to disbelieve [O'Brien] and to reach a verdict in [the plaintiff's] favor." Hamilton, 666 F.3d at 1357.

**D.      The Plaintiff's Alleged Interpersonal Difficulties**

Finally, O'Brien stated that she did not consider the plaintiff for the Acting Deputy Division Chief position because "when [the p]laintiff assumed a leading role, her responsiveness and legal skills were overshadowed by some interpersonal difficulties, occasional 'abrasiveness,' inflexibility, and an inability to handle a project from start to finish with minimum interference or clarification." Def.'s Mem. at 7 (quoting Def.'s Mot., Ex. A (O'Brien Interview) at 48–49). The plaintiff argues in response that these alleged interpersonal difficulties are pretextual because (1) O'Brien "never raised any concerns with [the plaintiff's] performance [or] interpersonal relationships," (2) O'Brien gave her the highest performance rating of "outstanding" in the performance period prior to selecting Tanner as the Acting Deputy Division Chief, and (3) the plaintiff has contemporary factual evidence demonstrating opposite realities.

14

Pl.'s Opp'n at 15 (citing id., Ex. 3 (performance evaluations); id., Ex. 16 (e-mails between the plaintiff and other employees)); see also id., Ex. 4 (performance awards).

O'Brien conceded in her EEOC hearing testimony that she never disciplined the plaintiff for her work on the KSDS case, the Quetzal case, or the plaintiff's supervision of the intern. See id., Ex. 8 (May 11, 2012 Hearing Tr.) at 211–12. When O'Brien was asked if she "sen[t the plaintiff] any e[-]mail[s] or anything alerting her to the fact that there were problems with her conduct on any of those three issues," O'Brien responded: "No. My approach was to try to get the work done . . . ." Id., Ex. 8 (May 11, 2012 Hearing Tr.) at 212 (explaining that her approach was "to just try to work productively and to get the work done and to inspire sort of a good team working relationship"). Moreover, the plaintiff correctly notes that she received an overall summary score of "outstanding" on her performance evaluation for the period at issue, which was the highest of four possible scores, immediately prior to when O'Brien appointed Tanner as Acting Deputy Division Chief in early 2008, see id., Ex. 3 (performance evaluations) at 34 (performance evaluation for the period of September 30, 2006, through October 1, 2007); as well as dozens of awards the plaintiff received from the FCC from 1997 through 2010, see id., Ex. 4 (performance awards) at 1–46, many for her performance during the crucial period of 2005 through 2008, see id., Ex. 4 (performance awards) at 16–21, 24, 30, which was when work was being conducted in the Quetzal and KSDS cases and the plaintiff was supervising the intern, see Def.'s Reply at 16, 18 n.10; see also St. John, 20 F. Supp. 3d at 90 (noting the relevance of a Title VII plaintiff's job "performance 'during the crucial . . . time period leading up to' the adverse employment action" (alterations in original) (quoting Fox v. Giaccia, 424 F. Supp. 2d 1, 8 (D.D.C. 2006))). And the performance awards the plaintiff received in 2005 through 2008 commended her for her "strong legal and professional skills," Pl.'s Opp'n, Ex. 4 (performance awards) at 17, her ability to "address[] a tremendous number of consumer complaints in an

15

extremely compressed time span," id., Ex. 4 (performance awards) at 19, her "long hours and successful[] complet[ion of] her assigned number of applications within the established deadlines," id., Ex. 4 (performance awards) at 21, and her "commendable" "work on [a] fast paced and complex project," id., Ex. 4 (performance awards) at 22.  Therefore, the Court agrees with the plaintiff that not only is there no contemporaneous evidence documenting the plaintiff's supposed interpersonal difficulties, but that the contemporaneous evidence actually demonstrates the contrary.  See Jarmon v. Genachowski, 720 F. Supp. 2d 30, 39 (D.D.C. 2010) (noting that "the substantial concerns regarding [the] plaintiff's performance that were never previously documented do create a question as to whether the decision makers honestly believed the reasons given and potentially give rise to an inference of discrimination").

Therefore, the Court concludes that, because O'Brien's proffered explanation regarding the plaintiff's alleged interpersonal difficulties "relies heavily—indeed entirely—on subjective considerations, and [the] case law instructs [the Court] to treat such explanations with caution on summary judgment," and there being an "absence of any [uncontested] contemporaneous documentation supporting that explanation," Hamilton, 666 F.3d at 1356, 1357, a reasonable jury could find this explanation to be pretextual and infer discrimination.[6]

## IV.   CONCLUSION

Considering the evidence in the light most favorable to the plaintiff, the Court finds that a reasonable jury could conclude that the FCC's explanations for not selecting the plaintiff for the Acting Deputy Division Chief position were pretextual and infer that the real reason for the

---

[6] The plaintiff also challenges the FCC's asserted explanation on the grounds that (1) she was substantially more qualified than Tanner for the Acting Deputy Division Chief position, see Pl.'s Opp'n at 6–10, 18–25; (2) O'Brien had a pattern of "hiring and promoting only Caucasians," id. at 18; and (3) the selection process for the position was irregular, id. at 15–16.  Having concluded that a reasonable jury could infer pretext given the lack of contemporaneous evidence documenting the plaintiff's alleged weaknesses, the Court need not resolve these arguments at this time.

plaintiff's non-selection was discrimination. Accordingly, the Court must deny the FCC's motion for summary judgment.

**SO ORDERED** this 14th day of August, 2017.[7]

REGGIE B. WALTON<br>United States District Judge

---

[7] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.